UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NICHOLAS OLIVA, INDIVIDUALLY AND AS
ADMINISTRATOR OF THE ESTATE OF
STEPHANIE OLIVA, DECEASED, and
CYNTHIA OLIVA,

                                 Plaintiffs,

                                                        Case # 13-CV-6377-FPG

v.

                                                        DECISION AND ORDER

TOWN OF GREECE, NEW YORK,
MERRITT RAHN,
JOHN AUBERGER,
BRIAN BALL, and
JOHN DOE,

                                 Defendants.

        Nicholas and Cynthia Oliva ("the Olivas") are the parents of Stephanie Oliva, an eighteen-year-old who was tragically killed in a motor vehicle accident in 2005. The Olivas bring this action claiming that the Defendants mishandled the investigation into their daughter's death, thereby precluding the Olivas from obtaining full damages in a wrongful death action. The Olivas plead this allegation as a denial of their constitutional right to access to the courts, the second such suit that the Olivas have brought in this District.[1] Defendants move to dismiss the case under Federal Rule of Civil Procedure 12(b)(6), arguing that the Olivas' Complaint fails to state a claim upon which relief could be granted. As the Plaintiffs have not – and cannot – plead the required elements of a right to access the courts claim, the Defendants' motion is granted, and this case is dismissed with prejudice.

---

[1] *See Oliva v. Town of Greece, et al.*; No. 11-CV-6189(MAT), 2012 WL 253423 (W.D.N.Y. Jan. 26, 2012).

BACKGROUND

Unless otherwise noted, the following facts are drawn from the Plaintiffs' Complaint[2]. On November 4, 2005, Stephanie Oliva ("Stephanie") was a passenger in a car that seventeen-year-old Chad Kenyon ("Kenyon") was driving in the late evening. Comp. ¶ 27. While driving eastbound on Ridge Road West in the Town of Greece, NY, Kenyon attempted to make a left turn, and collided with a car that was traveling westbound and was driven by Anthony DeCarlis ("DeCarlis"). Comp. ¶ 29. The collision partially ejected Stephanie from Kenyon's car, and she died as a result of the collision.

Officers from the Greece Police Department ("GPD") responded to the accident scene and began their investigation. Comp. ¶¶ 34, 50. Defendant Merritt Rahn[3] ("Rahn") was the Chief of Police of the GPD at the time of the accident and through the pendency of the investigation. Comp. ¶ 15. Defendant John Auberger ("Auberger") was the Supervisor of the Town of Greece and in that role, was responsible for municipal operations, including the GPD. Comp. ¶ 17. Brian Ball ("Ball"), then a sergeant with the GPD, oversaw the investigation and accident reconstruction of the November 4, 2005 crash. Comp. ¶ 21. Defendant John Doe, whose identity is unknown, was Sergeant Ball's supervisor during the investigation of Stephanie's death. Comp. ¶ 24.

As detailed in their Complaint, the Plaintiffs allege that the investigation into Stephanie's death was severely mishandled, and that each of the Defendants contributed to, or was responsible for, various acts of misconduct. Specifically, the Plaintiffs allege that the Town of

---

[2] Dkt. # 1, which will be cited to as "Comp." in this Decision.
[3] At the time this action was filed, Rahn was involved in a bankruptcy proceeding that caused any actions involving him to be automatically stayed under the provisions of federal bankruptcy law. After those proceedings were concluded, Rahn's counsel requested that he be permitted to join the Motion to Dismiss previously filed on behalf of Defendants John Auberger and the Town of Greece. That application was granted by Order docketed October 3, 2014. Dkt. # 16.

Greece and GPD failed to (1) investigate Kenyon's possible use of drugs and alcohol, despite Kenyon admitting at the scene to consuming over ten beers, having watery and bloodshot eyes, smelling strongly of alcohol, and testing positive for THC, the active ingredient in marijuana; (2) obtain statements from Kenyon and DeCarlis, as well as the other passenger in Kenyon's car, Joseph Marini; (3) investigate Kenyon, Marini and DeCarlis' pre-accident activities; (4) interview witnesses at the scene of the collision; (5) preserve and analyze a bag of marijuana found on DeCarlis at the hospital after the crash; and (6) examine and properly preserve Kenyon and DeCarlis' cars after the cars were taken into custody, which led to DeCarlis removing evidence from his impounded car and permitted the black box from DeCarlis' car to be removed and erased.  Comp. ¶ 124.

Additionally, the Plaintiffs accuse Ball of failing to (1) properly document and evaluate the accident scene, such as taking measurements and photos or using a computer-based reconstruction program to determine how the accident occurred; (2) issuing a false and premature press release that claimed drugs and alcohol were not involved in the crash before the results of the toxicology report were known; (3) falsely informing the Plaintiffs that drugs and alcohol were not involved in the crash; and (4) failing to consider whether speeding, road construction or other factors contributed to the crash, and instead concluding that the crash resulted from Kenyon making an improper left turn.  Comp. ¶¶ 67, 69, 137, 139, 140.  Ball did not charge DeCarlis with a crime.  Comp. ¶ 76.  He instead charged Kenyon with "failure to yield the right of way" and "driving out of class," both traffic infractions, but these charges were later dismissed when Ball and other GPD officers were unprepared during trial in Greece Town Court.  Comp. ¶¶ 83, 85.  Although Kenyon was initially arrested for DWI, Ball never filed formal DWI charges against him.  Comp. ¶ 42.

3

After the GPD investigation concluded, two reports in 2009 and 2010 criticized the GPD and Ball for their handling of the investigation. First, a collision reconstruction report from the New York State Police ("NYS Report") in 2009 concluded that a full reconstruction of the accident that led to Stephanie's death was impossible because the GPD and Ball failed to collect sufficient evidence. Comp. ¶¶ 89, 90. The NYS Report also stated that based on the evidence that did exist, Kenyon could have been charged with vehicular or involuntary manslaughter. Comp. ¶ 93. Second, after a widespread investigation into the GPD, Joseph Loszynski, the new Director of Public Safety for the Town of Greece, issued a "Report on the Investigation of the Town of Greece Police Department" ("Loszynski Report") in July 2010. Comp. ¶¶ 94, 95. The Loszynski Report did not discuss Stephanie by name, but the Plaintiffs allege that it alluded to the accident causing her death: in one instance, the Loszynski Report states that an "internal investigation substantiated that the MVA (motor vehicle accident) was not properly investigated which, in part, prevented a manslaughter prosecution of the operator who caused the fatal MVA." Comp. ¶ 96. The Plaintiffs claim that the issuance of the Loszynski Report was the first time they had official confirmation of the Defendants' misconduct concerning Stephanie's death. The Loszynski Report detailed many other instances of investigatory misconduct and oversight by the GPD. Comp. ¶¶ 98-105.

Despite the alleged mishandling of the investigation, the Plaintiffs did initiate legal proceedings against Kenyon and DeCarlis after Stephanie's death. First, in May 2008, the Plaintiffs received $38,319.55 after legal fees from Kenyon's $50,000 insurance policy. Dkt. # 7, Ex. B. Second, the Plaintiffs filed a request for arbitration with their insurance carrier to adjudicate a supplementary under-insured motorist ("SUM") claim based on Kenyon's policy limit. Comp. ¶¶ 93, 94. The arbitrator awarded the Plaintiffs $67,625 on this claim, and the

4

Monroe County Surrogate's Court entered an order to that effect on November 16, 2009. Dkt. # 7, Ex. C. After legal fees, the Plaintiffs received $42,971.34 in total from the SUM claim. *Id.* Third, the Plaintiffs brought two civil actions against DeCarlis in Monroe County Supreme Court seeking damages as a result of Stephanie's death. The first action was commenced on April 25, 2006, and the second on October 31, 2007. Dkt. # 8, Ex. C. The record does not indicate the disposition of the first case, while the second case against DeCarlis was struck from the calendar of New York State Supreme Court Justice William P. Polito for failure to file the note of issue by the required date.[4] Dkt. # 7, Ex. D.

Ultimately, the Plaintiffs commenced this federal right-to-access action, and claim that they did not receive the full amount of damages they would have otherwise received because of the Defendants mishandling of the investigation. Their Complaint alleges that this conduct denied them their constitutional right to access the courts.

In lieu of answering the Complaint, the Defendants have moved to dismiss the Complaint, arguing that because the Plaintiffs' opportunity to seek relief was not completely foreclosed, the Complaint fails to state a cause of action. Dkt. ## 7, 8. The Plaintiffs have responded in opposition to the motion (Dkt. ## 11, 12, 14), and Defendant Ball filed a reply memorandum. Dkt. # 13.

---

[4] When determining a Rule 12(b)(6) motion, the Court is generally confined to matters contained within the four corners of the Complaint. The details of the arbitrations and the New York State Court action brought by the Olivas are not listed within the Plaintiffs' Complaint, but the Defendants argue that these documents are properly considered by the Court as matters of which judicial notice could be taken, or as documents either in the Plaintiffs' possession or of which Plaintiffs had knowledge of and relied on in bringing their suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Plaintiffs concede that these documents meet that test, and are properly considered by the Court in resolving this motion. *See* Dkt. # 11, ¶¶ 19, 20.

DISCUSSION

In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The Supreme Court has instructed that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotations marks and citation omitted).

In this case, the Plaintiffs have pled three claims under 42 U.S.C. § 1983: municipal liability against the Town of Greece and GPD; individual liability against Ball; and supervisory liability against Rahn and/or John Doe. Of course, § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). The underlying constitutional rights that the Plaintiffs allege have been violated are their "rights to access the courts under the First, Sixth, and/or Fourteenth

Amendment." Comp. ¶ 119. Accordingly, the viability of the Plaintiffs' Complaint turns on the elements of a right to access the courts claim.

A constitutional right of access to the courts claim exists "to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong" because relief on an underlying cause of action is otherwise foreclosed. *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002). Right-of-access claims generally take one of two forms. The first are so-called "forward-looking" claims. These claims involve situations where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Id.* at 413. A forwarding-looking access claim is used to eliminate the barriers to judicial relief and "place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* For example, an indigent litigant who claims he was wrongfully denied *in forma pauperis* status and cannot therefore file his Complaint because he cannot pay the filing fee could bring a forward-looking claim. If the Court were to grant relief in that case, the Plaintiff could be granted *in forma pauperis* status, after which his underlying complaint would be filed without costs, and the litigation would proceed.

The second type of denial-of-access claim is a "backward-looking" claim. These cases involve underlying claims that "cannot now be tried (or tried with all material evidence), no matter what official action may be in the future" because "official acts...may allegedly have caused the loss or inadequate settlement of a meritorious case." *Id.* at 414. A backward-looking access claim does not break down barriers to judicial relief. Rather, judgment in the access claim itself serves as a substitute for relief from the underlying claim, which no longer can be litigated. This case falls into the category of a backward-looking claim.

The Second Circuit has stated that "[t]he viability of backward-looking right-of-access claims is far from clear in this Circuit." *Sousa v. Marquez*, 702 F.3d 124 (2012). The Circuit's statement stems from the *Christopher* decision, where "[t]he Supreme Court was careful *not* to endorse the validity of these backwards looking claims." *Sousa*, 702 F.3d at 127 (internal quotation marks omitted). Yet, assuming *arguendo* that the Second Circuit would recognize a backward-looking access claim, the claim would require two key elements.

First, a right of access complaint must identify and plead the underlying cause of action that has been lost. *See Christopher* 417-18. In the present Complaint, the underlying cause of action – wrongful death – has been pled, and none of the Defendants have attacked the present Complaint based upon this element.

Second, a right-of-access complaint must identify a remedy "that may be rewarded as recompense but not otherwise available." *Christopher*, 536 U.S. at 415. Accordingly, "backward-looking access claims are not cognizable if the plaintiff, claiming the government concealed or manipulated facts, was aware at the time of the earlier lawsuit of the facts giving rise to his claim." *Sousa*, 702 F.3d at 129. This is so, because "a plaintiff who has knowledge of the facts giving rise to his claim and an opportunity to rebut opposing evidence *does* have adequate access to a judicial remedy." *Id*. at 128.

The claim in this case cannot proceed because the Complaint fails the second required element of a right-to-access claim.[5] The pleadings and incorporated documents conclusively

---

[5] In Plaintiffs' first case before this court, United States District Judge Michael A. Telesca dismissed their Complaint for failing the first element of a right-of-access claim, namely, pleading the underlying cause of action. That defect was corrected in this case, and the Plaintiffs now identify wrongful death as the lost claim underlying their Complaint. Although the Plaintiffs claim that Judge Telesca's decision effectively held that backward right-of-access claims are viable in this District, *see, e.g.*, Dkt. # 11-2, at 11-12, the Plaintiffs are incorrect. Like the Second Circuit in *Sousa*, Judge Telesca assessed whether a right-of-access claim was satisfactorily pled without ruling on its validity. In any event, the Second Circuit's

demonstrate that Plaintiffs' ability to bring a wrongful death action was *not* "completely foreclosed," as is required by the Second Circuit. *Sousa*, 702 F.3d 128 (backward-looking claim could be available "only if a judicial remedy was completely foreclosed by the false statement or nondisclosure.") Not only did the Plaintiffs bring one successful claim and attempt to litigate another, but the Plaintiffs also had some knowledge of the Defendants' potential misconduct before the publication of the Loszynski Report.

Here, the Plaintiffs had sufficient knowledge to commence a wrongful death action against either of the drivers before the Loszynski Report confirmed the failures of the GPD's investigation. The Plaintiffs claim that "[i]t was not until release of the Town's Loszynski Report on or about July 29, 2010 that plaintiffs knew that '(t)he internal investigation substantiated that the MVA (the fatal motor vehicle accident) was not properly investigated which, in part, prevented a manslaughter prosecution of the operator who caused the fatal MVA.'" Dkt. # 11-2, at 9-10 (quoting the Loszynski Report ). Yet, the Plaintiffs concede in their Complaint that they previously learned certain facts regarding the accident, including that reports prepared by Ball or the GPD note that there were no skid marks at the scene, that an open bottle of malt liquor was found next to Kenyon's car, and that the Monroe County District Attorney's Office advised the Plaintiffs that "the concentration of THC in Kenyon's blood indicated that he [Kenyon] was legally impaired from the use of drugs at the time of the accident." Comp. ¶¶ 30, 36, 37, 71.

More fundamentally, the Plaintiffs case cannot proceed because the Plaintiffs were not "completely foreclosed" from commencing a wrongful death action regarding Stephanie's death

---

decision in *Sousa* was issued on December 13, 2012, approximately 11 months after Judge Telesca's decision.

for one simple and undeniable reason: they actually brought such an action in New York State Supreme Court.

As was previously stated, the Plaintiffs pursued actions against Kenyon in arbitration and against DeCarlis in New York State Supreme Court.  In bringing this action, the Plaintiffs want this Court to focus on their claim that the investigatory misconduct prevented them from obtaining greater damages from DeCarlis as well as punitive damages from Kenyon and DeCarlis. Dkt. # 11-1, ¶ 29.  The Plaintiffs' reply memorandum emphasizes this point, arguing that the amount of compensation they received was inadequate to compensate them for the loss of their daughter, and stating that they "never agreed or represented that the value of Stephanie's conscious pain and suffering and wrongful death was $117,625." Dkt. # 12, ¶ 21.

However true these points may be, they miss the point.  As the Second Circuit held in *Sousa*, if a backward-looking claim could be recognized, such a claim "would be available only if the governmental action caused the plaintiff's suit to be dismissed as untimely, or if official misconduct was so severe as to render hollow his right to seek redress.  This circumstance may arise, for example, if public officials withheld from the plaintiff key facts which would form the basis of the claims for redress.  *But such claims are available only if a judicial remedy was completely foreclosed by the false statement or nondisclosure.*" *Sousa*, 702 F.3d at 128 (internal citations and quotation marks omitted) (emphasis added).  In other words, the critical issue here is whether or not the Plaintiffs were "completely foreclosed" from seeking a judicial remedy.

While the Plaintiffs point out multiple instances of misconduct, the Second Circuit has explained that the "completely foreclosed" test applies even if some facts were concealed from the Plaintiffs, or if the Plaintiffs did not know or have access to every material fact prior to bringing suit.  This is so because most cases develop and get fleshed out through the discovery

process, and for that reason, additional defendants or claims may be added to a lawsuit as they are identified through discovery. *See* Fed. R. Civ. P. 15 and 21. Although the prior state court wrongful death action was dismissed for failure to file the note of issue, that fact is irrelevant to this right-of-access case, because "[i]f a party is aware of the basic facts undergirdling his claim but fails to make his case, whether through inadequate discovery or otherwise, he may not relitigate that dispute through a denial-of-access claim." *Sousa*, 702 F.3d at 129. While the Plaintiffs again strenuously argue that the acts and omissions of the GPD should allow them to proceed here, those acts and omissions are all matters that could have been addressed through the wrongful death action the Plaintiffs previously commenced in state court. "If a governmental official is lying, for instance, the plaintiff can attempt to demonstrate the falsity of the official's statements through discovery and argument before the court. The point of the backward-looking right of access [claim is] to ensure that plaintiffs have that opportunity – not to convert every instance of deception by a governmental witness into a separate federal lawsuit." *Id.*, at 128-29.

As one district court explained, backward right-to-access claims are available only where the Plaintiffs "have irrevocably lost the ability *to file* a lawsuit." *Ponterio v. Kaye*, No. 06-CV-6289 (HB), 2007 WL 141053, at *9 (S.D.N.Y. Jan 22, 2007), *aff'd* 328 F. App'x 671 (2d Cir. 2009) (emphasis added). The Second Circuit adopted that principle in *Sousa*, finding that the Plaintiffs claims must have been "completely foreclosed" in order to sustain a backward looking right-to-access claim. That simply is not the case here.

The misconduct relating to the investigation into Stephanie's death as described in the Loszynski Report is certainly troubling. However, this Court's responsibility is to determine whether, under binding precedent from the Second Circuit, the Plaintiffs can maintain a right-to-

access claim under the facts of this case.  Based upon the Second Circuit's decision in *Sousa*, the clear answer to that question is that they cannot, and this action must therefore be dismissed.

CONCLUSION

Although it is clear that a tragic death occurred, the law prohibits the claims that the Plaintiffs have raised in this action because their opportunity to litigate their underlying claims was not completely foreclosed.  As a result, and for all of the foregoing reasons, the Defendant's Motions to Dismiss (Dkt. ## 7, 8) are GRANTED, and this action is dismissed with prejudice. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

DATED:        December 1, 2014
              Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge